1

**THE WESTON FIRM**
GREGORY S. WESTON (239944)

2

*greg@westonfirm.com*
1405 Morena Blvd., Suite 201

3

San Diego, CA 92110
Telephone:     (619) 798-2006

4

Facsimile:     (619) 343-2789

5

**Counsel for Plaintiff**

6

7

8                    **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

9                         **FOR THE COUNTY OF SAN DIEGO**

10

11

12

LORETTA SCHWEINSBURG, on behalf
of herself and all others similarly situated,

13

Case No:     37-2022-00006951-CU-BT-CTL

14

Plaintiff,

**CLASS ACTION COMPLAINT VIOLATIONS OF THE
UNFAIR COMPETITION LAW AND FOR BREACH OF
IMPLIED WARRANTY**

15

v.

16

GENERAL MILLS, INC. and GENERAL
MILLS SALES, INC.,

17

**No Jury Demand**

18

Defendants.

19

20

21

22

23

24

25

26

27

28

---

CLASS ACTION COMPLAINT

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

**02/23/2022** at 11:21:35 AM

Clerk of the Superior Court
By Elizabeth Reyes,Deputy Clerk

## **TABLE OF CONTENTS**

I.      JURISDICTION AND VENUE ............................................................................................ 1

II.     NATURE OF THE ACTION ............................................................................................... 1

III.    PARTIES ............................................................................................................................ 2

IV.    NATURE OF TRANS FAT.................................................................................................. 2

      A.      There Is a Well-Established Scientific Consensus That Trans Fat Is Extremely Harmful. ........................................................................................................................ 3

      B.      The Artificial Trans Fat General Mills Added to Hamburger Helper Caused Cardiovascular Disease. ................................................................................................. 5

      C.      The Artificial Trans Fat General Mills Added to Hamburger Helper Caused Type-2 Diabetes. ......................................................................................................................... 7

      D.      The Artificial Trans Fat General Mills Added to Hamburger Helper Caused Breast, Prostate, and Colorectal Cancer. .................................................................................. 7

      E.      The Artificial Trans Fat General Mills Added to Hamburger Helper Caused Alzheimer's Disease and Cognitive Decline. ................................................................ 8

      F.      The Artificial Trans Fat General Mills Added to Hamburger Helper Caused Organ Damage. .......................................................................................................................... 9

      G.     PHO Use is Unlawful in California, the United States, and European Nations. ........... 10

V.      PLAINTIFF'S PURCHASES OF HAMBURGER HELPER .......................................... 11

VI.    THE USE OF PHO IN HAMBURGER HELPER WAS UNFAIR. ................................. 12

VII.   DEFENDANTS' PRACTICES WERE "UNLAWFUL" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW. ................................................... 14

VIII.   INJURY ............................................................................................................................ 15

      A.      Actual, Present, Physical Injury.................................................................................... 15

      B.      Substantial and Measurable Increase in Risk of Disease and Early Death.................. 16

      C.      Economic Injury............................................................................................................ 17

IX.    DELAYED DISCOVERY ................................................................................................ 18

X.      ADDITIONAL TOLLING ALLEGATIONS................................................................... 19

XI.    CLASS ACTION ALLEGATIONS ................................................................................. 19

XII.   PRAYER FOR RELIEF ................................................................................................... 23

XIII.   NO JURY DEMAND ....................................................................................................... 23

i

Plaintiff Loretta Schweinsburg, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby sues Defendants General Mills, Inc. and General Mills Sales, Inc. (collectively "General Mills" or "Defendants") and upon information and belief and investigation of counsel, alleges as follows:

## I.   JURISDICTION AND VENUE

1.   Jurisdiction is proper because Plaintiff is a citizen of California and because all claims are asserted under the laws of California and relate to a product that is sold in California and was purchased by Plaintiff in California.

2.   Venue is proper under Bus. & Prof. Code § 17203 because General Mills conducts continuous business in San Diego County and sold thousands of the product at issue in this county, and because thousands of class members reside in this county, who were harmed by the conduct of Defendants.

## II.   NATURE OF THE ACTION

3.   General Mills manufactures, distributes, and sells Hamburger Helper, Tuna Helper, and Chicken Helper (collectively "Hamburger Helper"), a line of packaged food products which contained partially hydrogenated oil ("PHO").

4.   Artificial trans fat is a toxin and carcinogen for which there are many safe and commercially viable substitutes. During the Class Period, Defendants added artificial trans fat to Hamburger Helper in the form of partially hydrogenated oil ("PHO").

5.   In orders dated November 8, 2013 and June 17, 2015, the FDA determined that PHO is unsafe for use in food. Tentative Determination Regarding Partially Hydrogenated Oils, 78 Fed. Reg. 67169 (Nov. 8, 2013) and Final Determination Regarding Partially Hydrogenated Oils, 80 Fed. Reg. 34650 (June 17, 2015). Yet Defendants continued to incorporate this illegal, dangerous additive into Hamburger Helper, even after the FDA declared it unsafe for use in food.

6.   Even before the FDA's two orders, however, PHO was an unlawful food additive under both California and federal law.

7.   Although safe, low-cost, and commercially acceptable alternatives to PHO existed throughout the Class Period, Defendants unfairly elected *not* to use these safe alternatives in Hamburger Helper in order to increase profit at the expense of the health of consumers.

1

8.     Plaintiff Loretta Schweinsburg repeatedly purchased Hamburger Helper from California grocery stores during the Class Period defined herein, for her personal and household consumption.

9.     This action is brought to remedy Defendants' unfair and unlawful conduct. On behalf of the class defined herein, Plaintiff seeks an order compelling Defendants to, *inter alia*: (1) award Plaintiff and the Class members restitution and (2) pay costs, expenses, and reasonable attorneys' fees.

### III.    PARTIES

10.    Defendants General Mills, Inc. and General Mills Sales, Inc. ("General Mills") are both Delaware corporations headquartered in Minnesota. Hamburger Helper is sold in stores throughout California.

11.    During the class period, General Mills owned, manufactured, distributed, and sold Hamburger Helper.

12.    Plaintiff Loretta Schweinsburg is a citizen of California who repeatedly purchased Hamburger Helper from California grocery stores during the class period for personal and household consumption.

### IV.    NATURE OF TRANS FAT

13.    Artificial trans fat is manufactured via an industrial process called partial hydrogenation, in which hydrogen atoms are added to normal vegetable oil by heating the oil to temperatures above 400°F in the presence of ion donor catalyst metals such as rhodium, ruthenium, and nickel.[1] The resulting product is known as partially hydrogenated oil, or PHO.

14.    PHO was invented in 1901 and patented in 1902 by German chemist Wilhelm Normann. PHO molecules chemically differ from the natural fat molecules in other food products.[2]

15.    Natural fat, except the trace amounts of natural trans fat from ruminant animal sources like beef, milk, and mutton, comes in two varieties: (1) fats that lack carbon double bonds ("saturated fat"); and

---

[1] *See* Alice H. Lichtenstein, *Trans Fatty Acids, Plasma Lipid Levels, and Risk of Developing Cardiovascular Disease*, 95 CIRCULATION 2588, 2588-90 (1997).

[2] *See* Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 NEW ENG. J. MED. 94, 94-8 (1999). *See also* Walter Willett, *The Scientific Case for Banning Trans Fats*, SCIENTIFIC AMERICAN, *available at* www.scientificamerican.com/article/the-scientific-case-for-banning-trans-fats/ (last visited February 18, 2022).

(2) fats that have carbon double bonds. Trans fat, in contrast to cis fat, has carbon double bonds with hydrogen atoms on opposite sides of the carbon chain.



16.     PHO was initially a "wonder product" attractive to the processed food industry because it combined the low cost of unsaturated *cis* fat with the flexibility and long shelf life of saturated fat. Like processed *cis* fat, PHO is manufactured from low-cost legumes,[3] while saturated fat is derived from relatively expensive animal and tropical plant sources.[4]

17.     As detailed herein, PHO causes cardiovascular disease, diabetes, cancer, and Alzheimer's disease, and accelerates memory damage and cognitive decline. These risks were well known during the entire Class Period, and at no point during the Class Period was there ever a consensus that PHO was safe to use, neither in general nor as an ingredient in packaged food products.

18.     In using PHO in Hamburger Helper, Defendants failed to submit a food additive petition and failed to undertake a GRAS self-determination.

**A.   There Is a Well-Established Scientific Consensus That Trans Fat Is Extremely Harmful.**

19.     The National Academies of Science were charted by an act of Congress, signed by President Lincoln in 1863. Under that charter, in 1970, the National Academy of Medicine was created. In a 2005 report, under its former name of the Institute of Medicine, it concluded there was "no safe level" of PHO or artificial trans fat intake.[5] Therefore, in 2005, there was no consensus that PHO was a safe ingredient to use in food. To the contrary, the consensus was that it is unsafe.

20.     In addition, "trans fatty acids are not essential and provide no known benefit to human

---

[3] e.g., corn oil, cottonseed oil, soybean oil, peanut oil

[4] e.g., butter, cream, tallow, palm oil, coconut oil

[5] Food & Nutrition Bd., Inst. of Med., *Dietary Reference Intakes For Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids* (2005).

3

health."[6] Thus, while IOM provided safe maximum levels for other food elements like saturated fat, it could not and declined to provide one for trans fat when requested by the FDA, the reason being that "**any** incremental increase in trans fatty acid intake increases the risk of CHD." *Id.* (emphasis added).

21.     In 2006, Dariush Mozaffarian of Harvard Medical School wrote in the New England Journal of Medicine, "the consumption of trans fatty acids results in considerable potential harm but no apparent benefit."[7]

22.     Julie Louise Gerberding, who served eight years as the head of the United States Centers for Disease Control and Prevention, wrote in 2009:

> The scientific rationale for eliminating exposure to artificial trans fatty acids in foods is rock solid. There is no evidence that they provide any health benefit, and they are certainly harmful. These compounds adversely affect both low- and high-density lipoprotein cholesterol levels and increase the risk for coronary heart disease, even at relatively low levels of dietary intake. Gram for gram, trans fats are far more potent than saturated fats in increasing the risk for heart disease, perhaps because they also have pro-inflammatory properties and other adverse effects on vascular endothelium . . . Eliminating exposure to these dangerous fats could have a powerful population impact—potentially protecting 30,000 to 100,000 Americans from death related to heart disease each year.[8]

23.     Dr. Mozaffarian further writes:

> Given the adverse effects of trans fatty acids on serum lipid levels, systemic inflammation, and possibly other risk factors for cardiovascular disease and the positive associations with the risk of CHD, sudden death from cardiac causes, and possibly diabetes, the potential for harm is clear. The evidence and the magnitude of adverse health effects of trans fatty acids are in fact far stronger on average than those of food contaminants or pesticide residues, which have in some cases received considerable attention.[9]

24.     In 2011, Walter Willet, also a professor at Harvard Medical School, described Defendants'

---

[6] *Food Labeling; Health Claim; Phytosterols and Risk of Coronary Heart Disease; Proposed Rule*, 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010).

[7] Dariush Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 N. ENGL. J. MED. 1601, 1608-1609 (2006).

[8] Julie Louise Gerberding, *Safer Fats for Healthier Hearts: The Case for Eliminating Dietary Artificial Trans Fat Intake*, 151 ANN. INTERN. MED. 137-138 (2009).

[9] Dariush Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 N. ENGL. J. MED. 1601 (2006).

1   behavior of selling food made with PHO as "a food safety issue . . . this is actually contamination."[10]

2       25.    The views of these experts, and many others, show that, even before the FDA formally

3   declared PHO to be unsafe for use in food in 2015, its use was still unlawful because there was not a

4   consensus of scientific experts that PHO was a safe food additive.

5   **B.  The Artificial Trans Fat General Mills Added to Hamburger Helper Caused Cardiovascular**

6   **Disease.**

7       26.    Trans fat raises the risk of CHD more than any other known consumed substance.[11]

8       27.    A 1999 estimate published in the New England Journal of Medicine found that removing

9   PHO from the American diet "would prevent approximately 30,000 premature coronary deaths per year,

10   and epidemiologic evidence suggests this number is closer to 100,000 premature deaths annually."[12]

11       28.    By raising LDL levels and lowering HDL levels, trans fat causes a wide variety of dangerous

12   heart conditions, including vasoconstriction, coronary artery disease, and primary cardiac arrest.

13       29.    In a 2005 joint Dietary Guidelines Advisory Committee Report, the Department of Health

14   and Human Services and the U.S. Department of Agriculture recognized that "[t]he relationship between

15   trans fatty acid intake and LDL cholesterol is direct and progressive, increasing the risk of cardiovascular

16   disease."[13]

17       30.    The American Heart Association warns, "trans fats raise your bad (LDL) cholesterol levels

18   and lower your good (HDL) cholesterol levels. Eating trans fats increases your risk of developing heart

19   disease."[14]

20       31.    Even further back, in 2003, a review of literature on the connection between the

21   consumption of artificial trans fat and coronary heart disease, the FDA concluded:

22       [B]ased on the consistent results across a number of the most persuasive types of study designs

---

23   [10] Rebecca Coombes, *Trans fats: chasing a global ban*, 343 BRITISH MED. J. (2011).

24   [11] Mozaffarian, 354 NEW ENG. J. MED. at 1603.

25   [12] Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 NEW ENG. J. MED. 94, 94-8

26   (1999).

27   [13] Dep't of Health & Human Serv. & U.S. Dep't of Agric., 2005 Dietary Guidelines Advisory Committee
Report, Section 10 (2005).

28   [14] Am. Heart Ass'n, *Trans Fats, available at* https://www.heart.org/en/healthy-living/healthy-eating/eat-smart/fats/trans-fat (last visited February 15, 2022).

(i.e., intervention trials and prospective cohort studies) that were conducted using a range of test conditions and across different geographical regions and populations . . . the available evidence for an adverse relationship between trans fat intake and CHD risk is strong.[15]

32.    The FDA concluded in 2010 that "there have been no reports issued by authoritative sources that provide a level of trans fat in the diet . . . below which there is no risk of [Coronary Heart Disease]." 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010). Rather, there "is a positive linear trend between trans fatty acid intake and LDL cholesterol concentration, and therefore there is a positive relationship between trans fatty acid intake and the risk of CHD." *Id.*

33.    A study published in American Heart Association's *Circulation* found that the largest consumers of trans fat have three times the risk of suffering primary cardiac arrest, even after controlling for a variety of medical and lifestyle risk factors.[16]

34.    Australian researchers observed that heart attack patients possess elevated amounts of trans fat in their adipose tissue (stored body fat) compared to controls. The effects of consuming trans fat are therefore shown to be long-lived because of its storage within the body in place of natural fats.[17]

35.    Cholesterol dysregulation and systemic inflammation/immune system dysregulation are the most important pathways through which PHO consumption causes morbidity and death. Another route is by promoting atherosclerosis by degrading the function of TGF-β, a protein responsible for preventing the development of atherosclerotic lesions.[18]

36.    TGF-β also functions to suppress cancerous tumors. Degradation of TGF-β function is also likely one route by which artificial trans fat consumption promotes cancers in fatty organs and the digestive system. *Id.*

---

[15] FDA, Final Rule, 68 Fed. Reg. 41433, 41445 (July 11, 2003).

[16] Rozenn N. Lemaitre et al., *Cell Membrane Trans-Fatty Acids and the Risk of Primary Cardiac Arrest*, 105 CIRCULATION 697, 697-701 (2002).

[17] Peter M. Clifton et al., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction.* 134 J. NUTR. 874, 874-79 (2004).

[18] Chen, C.L. et al., *A mechanism by which dietary trans fats cause atherosclerosis*, J. NUTR. BIOCHEMISTRY 22(7) 649-655 (2011).

CLASS ACTION COMPLAINT

**C.** **The Artificial Trans Fat General Mills Added to Hamburger Helper Caused Type-2 Diabetes.**

37.     Artificial trans fat also causes type-2 diabetes.[19]

38.     In particular, trans fat disrupts the body's glucose and insulin regulation system by incorporating itself into cell membranes, causing the insulin receptors on cell walls to misform and malfunction, and in turn elevating blood glucose levels and stimulating further release of insulin.

39.     Researchers at Northwestern University's medical school found that mice show multiple markers of type-2 diabetes after eating PHO for only four weeks.[20]

40.     By the eighth week of the study, mice fed the high trans fat diet showed a 500% increase compared to the control group in hepatic interleukin-1β gene expression, one such marker of diabetes, indicating the extreme stress even short-term exposure to artificial trans fat places on the body. *Id.*

41.     A 14-year study of 84,204 women found that for every 2 percent increase in energy intake from artificial trans fat, the relative risk of type-2 diabetes was increased by 39 percent.[21]

**D.** **The Artificial Trans Fat General Mills Added to Hamburger Helper Caused Breast, Prostate, and Colorectal Cancer.**

42.     Trans fat is a carcinogen which causes breast, prostate, and colorectal cancer.

43.     A 13-year study of 19,934 French women showed 75 percent more women contracted breast cancer in the highest quintile of trans fat consumption than did those in the lowest.[22]

44.     In a 25-year study of 14,916 American physicians, those in the highest quintile of trans fat consumption had more than double the risk of developing prostate cancer than the doctors in the lowest

---

[19] Am. Heart Ass'n., *Trans Fats*, *available at* https://www.heart.org/en/healthy-living/healthy-eating/eat-smart/fats/trans-fat (last visited February 15, 2022).

[20] Sean W. P. Koppe et al., *Trans fat feeding results in higher serum alanine aminotransferase and increased insulin resistance compared with a standard murine high-fat diet*, 297 AM. J. PHYSIOL. GASTROINTEST LIVER PHYSIOL. 378 (2009).

[21] Jorge Salmeron et al., *Dietary Fat Intake and Risk of Type 2 Diabetes in Women*, 73 AM. J. CLINICAL NUTRITION 1019, 1023 (2001).

[22] Véronique Chajès et al., *Association between Serum Trans-Monounsaturated Fatty Acids and Breast Cancer Risk in the E3N-EPIC Study*, 167 AM. J. EPIDEMIOLOGY 1312, 1316 (2008).

7

quintile.[23]

45.     A study of 1,012 American males observing trans fat intake and the risk of prostate cancer found "[c]ompared with the lowest quartile of total trans-fatty acid consumption, the higher quartiles gave odds ratios (ORs) equal to 1.58," meaning those in the highest quartile are 58% more likely to contract prostate cancer than those in the lowest.[24]

46.     A 600-person study found an 86 percent greater risk of colorectal cancer in the highest trans fat consumption quartile.[25]

47.     A 2,910-person study found "trans-monounsaturated fatty acids . . . were dose-dependently associated with colorectal cancer risk," which showed "the importance of type of fat in the etiology and prevention of colorectal cancer."[26]

**E.   The Artificial Trans Fat General Mills Added to Hamburger Helper Caused Alzheimer's Disease and Cognitive Decline.**

48.     Trans fat causes Alzheimer's disease and cognitive decline.

49.     In a study examining 815 Chicago area seniors, researchers found "increased risk of incident Alzheimer disease among persons with high intakes of . . . trans-unsaturated fats."[27]

50.     The study "observed a strong increased risk of Alzheimer disease with consumption of trans-unsaturated fat." *Id.*

51.     In a study of 1,486 women with type-2 diabetes, researchers found "[h]igher intakes of . . . trans fat since midlife . . . were [] highly associated with worse cognitive decline . . . ."[28]

---

[23] Jorge Chavarro et al., *A Prospective Study of Blood Trans Fatty Acid Levels and Risk of Prostate Cancer*, 47 PROC. AM. ASSOC. CANCER RESEARCH 95, 99 (2006).

[24] Xin Liu et al., *Trans-Fatty Acid Intake and Increased Risk of Advanced Prostate Cancer: Modification by RNASEL R462Q Variant*, 28 CARCINOGENESIS 1232, 1232 (2007).

[25] L.C. Vinikoor et al., *Consumption of Trans-Fatty Acid and its Association with Colorectal Adenomas*, 168 AM. J. EPIDEMIOLOGY 289, 294 (2008).

[26] Evropi Theodoratou et al., *Dietary Fatty Acids and Colorectal Cancer: A Case-Control Study*, 166 AM. J. EPIDEMIOLOGY 181 (2007).

[27] Martha Clare Morris et al., *Dietary Fats and the Risk of Incident Alzheimer Disease*, 60 ARCH. NEUROL. 194, 198-99 (2003).

[28] Elizabeth E. Devore et al., *Dietary Fat Intake and Cognitive Decline in Women with Type 2 Diabetes*, 32 DIABETES CARE 635 (2009).

52.     The study cautioned "[d]ietary fat intake can alter glucose and lipid metabolism and is related to cardiovascular disease risk in individuals with type 2 diabetes. Because insulin, cholesterol, and vascular disease all appear to play important roles in brain aging and cognitive impairments, dietary fat modification may be a particularly effective strategy for preventing cognitive decline, especially in individuals with diabetes." *Id.* (citations omitted).

53.     Artificial trans fat also damages the brains of those who consume it. A study conducted by UCSD School of Medicine of 1,018 men, mostly younger men, found trans fat consumption to be strongly correlated with impaired memory.[29] The authors of the study, appearing in *Circulation*, the American Heart Association's peer-reviewed journal, conclude that "[gr]eater dTFA [dietary trans fatty acid] was significantly associated with worse word memory in adults aged 20-45 years, often critical years for career building."

54.     Performing a word memory test, each additional gram per day of trans fat consumed was associated with 0.76 fewer words correctly recalled. The authors suggest trans fat's well-established pro-oxidant effect and its damage to cell energy processes is the pathway by which trans fat consumption damages memory ability. The young men with the highest trans fat consumption scored 12 fewer recalled words on the 104-word test. *Id.*

**F.     The Artificial Trans Fat General Mills Added to Hamburger Helper Caused Organ Damage.**

55.     Artificial trans fat molecules are readily incorporated into blood and organ cells in place of natural fat molecules, which damages vital organs, including the heart, brain, and reproductive system.

56.     The uptake of chemically distinct trans fat into cells induces systemic inflammation, where the immune system fails to recognize the distorted cells as native to the body and becomes persistently overactive, leading to further organ damage.[30]

---

[29] Golomb, B. et al., *Trans Fat Consumption is Adversely Linked to Memory in Working-Age Adults*, CIRCULATION. 130:A15572 (2014).

[30] *See:*

Lopez-Garcia et al., *Consumption of Trans Fat is Related to Plasma Markers of Inflammation and Endothelial Dysfunction*, 135 J. NUTR. 562-66 (2005);

CLASS ACTION COMPLAINT

57.     Trans fat "intake increases systemic inflammation in generally healthy persons."[31]

58.     Such inducers of inflammation "alter the functionality of tissues and organs and leads to harmful induction of different barrier systems in the body" including "the blood-brain barrier, the blood-retinal barrier, blood-nerve barrier, blood-lymph barrier and the blood-cerebrospinal fluid barrier."[32]

59.     This industrially produced artificial trans fat "intake increases the risk of cardiovascular disease (CVD) and type 2 diabetes as seen in large prospective cohort studies."[33]

60.     The inflammation it causes "leads to a wide range of tissue injuries and human diseases including cardiovascular diseases, diabetes, and multi-organ failure."[34]

61.     Further, trans fat consumption "contribute[s] to and aggravate[s] atherosclerotic lesions."[35]

62.     Such "chronic low-grade systemic inflammation" also induces "DNA damage" and is one "explanation for the relationship between chronic systemic inflammation and cancer."[36]

**G. PHO Use is Unlawful in California, the United States, and European Nations.**

63.     New York City banned trans fat in restaurants in 2006.

64.     A 2004 Danish law restricted all foods to fewer than 2 percent of calories from artificial

---

Baer et al., *Dietary fatty acids affect plasma markers of inflammation in healthy men fed controlled diets; a randomized crossover study*, 79 AM. J. CLIN. NUTR. 969-73 (2004);

Mozaffarian & Clarke, *Quantitative effects on cardiovascular risk factors and coronary heart disease risk of replacing partially hydrogenated vegetable oils with other fats and oils*, 63 EURO. J. CLIN. NUTR. S22-33 (2009);

Mozaffarian et al., *Trans Fatty acids and systemic inflammation in heart failure*, 80 AM. J. CLIN. NUTR. 1521-25 (2004).

[31] Mozaffarian, *Trans Fatty acids and systemic inflammation in heart failure*, 80 AM. J. CLIN. NUTR. 1521-25 (2004).

[32] Rönnbäck and Hansson, *The Importance and Control of Low Grade Inflammation Due to Damage of the Cellular Barrier Systems that May Lead to Systemic Inflammation*, 10 FRONTIERS IN NEUROLOGY 1-8 (2019).

[33] Bendsen, Stender, *Effect of industrially produced trans fat on markers of systemic inflammation: evidence from a randomized trial in women*, 52 J. OF LIPID RESEARCH 1821-28 (2011).

[34] Glaros, Larsen, *Macrophages and fibroblasts during inflammation, tissue damage and organ injury*, 14 FRONTIERS IN BIOSCIENCE 3988-3993 (2009).

[35] Hadj, *Correlation of trans fatty acids with the severity of coronary artery disease lesions*, 17 LIPIDS IN HEALTH AND DISEASE 1-13 (2018).

[36] Arimura, Ken et al., *Chronic low-grade systemic inflammation causes DNA damage in the lungs of mice*, 190 LUNG 613-20 (2012).

CLASS ACTION COMPLAINT

1  trans fat, a test that Hamburger Helper did not meet during the Class Period.

2       65.      Switzerland passed the same restriction in 2008.[37]

3       66.      A study of Denmark's 2004 trans fat ban concluded it "did not appreciably affect the quality,

4  cost or availability of food" and did not have "any noticeable effect for the consumers."[38]

5       67.      These laws were all motivated by the strong evidence trans fat is dangerous, showing that

6  during the Class Period, there was not a scientific consensus that PHO was a safe food additive.

7       68.      On June 17, 2015, the FDA released a declaratory order which it called its Final

8  Determination Regarding Partially Hydrogenated Oils, finding that "PHOs are not GRAS for any use in

9  human food." 80 Fed. Reg. 34650, 34651 (June 17, 2015) ("Final Determination").

10      69.      The FDA's Final Determination noted that "if there are data and information that

11 demonstrates to a reasonable certainty that no harm will result from a specific use of a PHO in food, that

12 information could be submitted as part of a food additive petition to FDA seeking issuance of a regulation

13 to prescribe conditions under which the additive may be safely used in food." Final Determination at 34664.

14      70.      On June 11, 2015 and March 7, 2017, the Grocery Manufacturers Association ("GMA")

15 submitted such a food additive petition and then an amended petition seeking approval to use partially

16 hydrogenated oil in "approximately 60 food categories." On May 21, 2018, the FDA denied the amended

17 GMA petition, and stated it considered the first one abandoned. In doing so, the FDA rejected the GMA's

18 argument for a "non-linear dose response" model and noted that "the vast majority of scientific studies

19 have been consistent in their conclusions that trans fat consumption has a progressive and linear adverse

20 effect on blood lipids and CHD risk." Denial of Food Additive Petition, 83 Fed. Reg. 23382, 23390 (May

21 21, 2018).

22      **V.    PLAINTIFF'S PURCHASES OF HAMBURGER HELPER**

23      71.      Plaintiff Loretta Schweinsburg regularly purchased and consumed Hamburger Helper from

24 California grocery stores during the Class Period. She personally consumed approximately two kilograms

25

26

---

27 [37] Andrew Collier, *Deadly Fats: Why Are We still Eating Them?*, The Independent (UK), June 10, 2008.

28 [38] Mozaffarian, 354 NEW ENG. J. MED. at 1610; *see also* Steen, Stender, *High Levels of Industrially Produced Trans Fat in Popular Fast Food*, 354 NEW ENG. J. MED. 1650, 1652 (2006).

1   of PHO during the Class Period from Hamburger Helper. This consumption caused permanent harm to

2   her body.

3       72.    Plaintiff consumed a dangerous amount of an illegal and dangerous food additive.

4       73.    California common law has long imposed on manufacturers of food an implied "warranty

5   extended to every consumer is that the food is fit for the purpose for which it was intended, namely, for

6   human consumption." *Klein v. Duchess Sandwich Co.*, 14 Cal. 2d 272, 284 (1939). Regardless of its intent,

7   such warranty was conveyed by General Mills in all of its sales, relied upon by Schweinsburg in all of her

8   purchases, and violated by the intentional addition of trans fat to General Mills' Hamburger Helper.

9

10          **VI.    THE USE OF PHO IN HAMBURGER HELPER WAS UNFAIR.**

11      74.    General Mills' use of PHO in Hamburger Helper was always unnecessary. There were

12  several safe substitutes for PHO and artificial trans fat throughout the Class Period.

13      75.    During the Class Period, most manufacturers of competing packaged food products

14  responsibly decided to refrain from adding artificial trans fat to their products.

15      76.    Although commercially viable alternative formulations and substitutes for PHO were

16  available, General Mills elected not to use them in Hamburger Helper in order to increase its profits at the

17  expense of consumers' health.

18      77.    General Mills' practices as described herein were "unfair" within the meaning of the Unfair

19  Competition Law because Defendants' conduct was immoral, unethical, unscrupulous, or substantially

20  injurious to consumers, and the utility of the conduct to Defendants does not outweigh the gravity of the

21  harm to class members.

22      78.    General Mills was well aware of the health risks associated with artificial trans fat

23  consumption throughout the Class Period yet chose to continuing using PHO as an ingredient.

24      79.    Although commercially viable alternative formulations and substitutes for PHO were

25  available, General Mills elected not to use them in Hamburger Helper in order to increase its profits at the

26  expense of consumers' health.

27      80.    As early as 2008, General Mills claimed to be in the process of reformulating some of its

28  products to reduce PHO content in light of medical studies demonstrating the numerous health harms

1   associated with the consumption of artificial trans fat.[39]

2       81.     General Mills has acknowledged that, "health officials . . . recommend eating the least

3   amount of trans fat as possible." *Id.*

4       82.     In its 2010 annual report, General Mills acknowledged "consumer concerns regarding the

5   health effects of ingredients such as . . . trans fats."

6       83.     Though General Mills claimed to be reformulating most of its products to eliminate PHO

7   in the interest of public health, it simultaneously resisted the FDA's efforts to ban the use of PHO in foods.

8       84.     In 2013, the FDA tentatively determined that "industrially-produced trans fatty acids, or

9   trans fat, are not generally recognized as safe (GRAS) for any use in food based on current scientific

10  evidence establishing the health risks associated with the consumption of trans fat."[40]

11      85.     In a comment responding to the FDA's tentative determination, General Mills argued that

12  "PHOs are fundamentally safe at low levels" and urged the FDA to consider implementing limits on PHO

13  use, rather than banning it.

14      86.     In its Final Determination Regarding Partially Hydrogenated Oils, the FDA stated it "does

15  not agree that such a threshold has been identified based on the available science."[41]

16      87.     Further, the FDA noted that, contrary to General Mills' assertion, "no comments provided

17  evidence that any uses of PHOs meet the GRAS standard, or evidence that would establish a safe threshold

18  exposure level." *Id.* at 34666.

19      88.     While the addition of PHO to Hamburger Helper may have some utility to General Mills

20  in that it allowed it to realize higher profit margins than safe ingredients, this utility is small and far

21  outweighed by the gravity of the serious health harm General Mills inflicted upon consumers.

22      89.     Defendants' conduct injured competing manufacturers of similar products that did not

23  engage in its unfair, immoral behavior, especially given the limited retail shelf space.

24      90.     Moreover, Defendants' practices violated public policy as declared by specific

25  constitutional, statutory, or regulatory provisions, including the FDCA, the Food Additives Amendment

---

27  [39] *See* https://ask.generalmills.com/s/article/What-are-trans-fats-and-why-do-food-manufacturers-use-them (last visited February 15, 2021).

28  [40] 78 Fed. Reg. 67169 (Nov. 8, 2013).
    [41] 80 Fed. Reg. 34650, 34653 (June 17, 2015).

1  of 1958, Health & Safety Code § 110545, and California Education Code § 49431.7.

2      91.    Defendants' actions also violated public policy by causing the United States, California,

3  and every other state to pay—via Medicare, Medicaid, Affordable Care Act Exchange subsidies, veterans'

4  health programs, public employee and retiree health insurance—for treatment of trans fat-related illnesses.

5      92.    Further, the injury to consumers from Defendants' practices was substantial, not

6  outweighed by benefits to consumers or competition, and not one that consumers themselves could

7  reasonably have avoided. Rather, the burden of avoiding dangerous and unapproved food additives is not

8  reasonably placed on the general public, who have varied levels of education and familiarity with food

9  safety, but rather on the manufacturers of food, both as a matter of equity and as a matter of efficiency.

10     93.    These unfair acts were also oppressive and malicious. General Mills knew that PHO causes

11  death and disease, and that most competing packaged food manufacturers did not use PHO for this reason.

12  It nonetheless decided to place its desire for profit above the health of its customers.

13  **VII.    DEFENDANTS' PRACTICES WERE "UNLAWFUL" WITHIN THE MEANING OF**

14  **THE CALIFORNIA UNFAIR COMPETITION LAW.**

15     94.    Defendants' practices as described herein are "unlawful" within the meaning of the

16  California Unfair Competition Law because PHO is not Generally Recognized as Safe (GRAS).

17  Therefore, Defendants' use of PHO was unlawful under 21 U.S.C. § 342.

18     95.    The PHO used in Hamburger Helper appears nowhere on the FDA's list of the hundreds

of substances it considers GRAS. *See* 21 C.F.R. §§ 181, 182, 184 and 186.

19     96.    PHO also fails to meet the fundamental requirement for GRAS status—that the substance

20  is safe. In fact, the FDA has explicitly recognized that there is no safe level of artificial trans fat

21  consumption.

22     97.    Under the Food Additives Amendment of 1958, which amended the FDCA, all food

23  additives are unsafe unless they (1) fall within a specified exemption to the statute's definition of food

24  additive, or (2) their use is pursuant to FDA approval. Because the PHO used in Hamburger Helper do not

meet either of these exceptions, they are, and long have been, unsafe and unlawful for use in food under

25  21 U.S.C. § 342.

26     98.    On November 8, 2013, the FDA tentatively determined PHO is not GRAS. 78 Fed. Reg.

27  67169 (November 8, 2013).

28     99.    On June 17, 2015, after extensive public comment, the FDA determined trans fat is not

14

GRAS. 80 Fed. Reg. 34650 (June 17, 2015).

100.    At no point during the Class Period was there a scientific consensus that PHO was safe. Indeed, for more than two decades, the scientific consensus has been that it is unsafe.

101.    In using PHO as a food additive prior to 2015, Defendants failed to submit a food additive petition and failed to undertake a GRAS self-determination.

102.    Defendants' conduct was further "unlawful" because it violated the Federal Food, Drug and Cosmetic Act ("FDCA"), specifically,

- 21 U.S.C. § 331(a);
- 21 U.S.C. § 331(b);
- 21 U.S.C. § 331(c); and
- 21 U.S.C. § 348

103.    Defendants' conduct further violated the California Sherman Food, Drug, and Cosmetic Law. Defendants' conduct also violates California's Health and Safety Code, which prohibits the manufacture, delivery, and sale of food that "contains any poisonous or deleterious substance that may render it injurious to health of man or any other animal that may consume it." *Id.* at § 110545.

## VIII.    INJURY

### A. **Actual, Present, Physical Injury**

104.    General Mills' unlawful and unfair acts physically damaged and deformed Schweinsburg's brain, blood, arterial, venous, lymphatic, and immune cells, which in turn damaged her brain, immune, glucoregulatory and cardiovascular systems. The physical pathways by which this damage was caused was established by scientists well before the Class Period, which is why they condemned, in the strongest terms, the behavior of companies like General Mills that added trans fat to food. These pathways are shown in this illustration which appeared in the April 13, 2006 issue of the New England Journal of Medicine.

CLASS ACTION COMPLAINT

105.    General Mills was at all times aware that it was causing physical harm to its customers. It was also aware its competitors largely did not add trans fat to their packaged food products. General Mills, however, continued to knowingly poison Schweinsburg and millions of other people.

106.    Throughout the Class Period, Hamburger Helper contained an unsafe amount of artificial trans fat which rendered them unfit for their ordinary use.

**B.  Substantial and Measurable Increase in Risk of Disease and Early Death.**

107.    General Mills' conduct caused Schweinsburg the further injury of permanently placing her at a substantially higher risk of disease and death, in particular heart disease, type-2 diabetes, and cancer.

108.    Schweinsburg's increased risk is measurable and quantifiable by epidemiologists, who have large studies from which they can and have calculated such increased risk of death and disease from trans fat consumption. These epidemiological studies include:

- The Nurses' Health Study

- The Framingham Heart Study

16

- Health Professionals Follow-up Study

- Australian Longitudinal Study of Women's Health

- PREvención con DIeta MEDiterránea (PREDIMED) study

## C. **Economic Injury**

109.    During the Class Period, Hamburger Helper was made with added trans fat, and therefore was not fit for human consumption, and had a value of $0 or less. The reason it had a value of $0 or less is because of the unfair conduct described in this Complaint, and for no other reason.

110.    Ms. Schweinsburg was unaware that Hamburger Helper was poisonous when she purchased them. She surrendered the purchase price of Hamburger Helper because she believed it was fit for human consumption under California law, and she would have surrendered no money if she had known of General Mills' conduct.

111.    Plaintiff purchased Hamburger Helper in California grocery stores in reliance on the assumption that food sold for human consumption in large stores would comply with federal and California food safety laws which prohibit the sale of food containing poisonous and deleterious substances. Schweinsburg had no obligation to investigate if food sold for human consumption had illegal and poisonous ingredients, rather, the law of California granted her an entitlement to assume that food sold in sealed packages is legal to sell and safe to consume.

112.    Conversely, General Mills had an unshiftable and unwaivable duty to ensure all the ingredients in the products it sold as food in California were legal and not poisonous. Aware of this duty, General Mills choose to disregard it in order to increase its profits, as its artificial trans fat was cheaper than the safe natural fats used by its competitors. Both the physical and economic injuries Schweinsburg suffered are the direct and but-for results of General Mills' decision to add trans fat to Hamburger Helper.

113.    Plaintiff suffered an economic injury in an amount equal to the amount she paid for Hamburger Helper, as well as medical monitoring costs. These economic injuries are the direct result of General Mills' addition of artificial trans fat to Hamburger Helper, and would not have occurred but for the conduct described in this complaint.

114.    Plaintiff was not injured merely by purchasing products that were illegally and unfairly sold, but by paying money for products that, *because of General Mills' conduct*, had no economic value.

17

115.     Had General Mills not violated Health & Safety Code § 110545, Plaintiff would have received value for her money, but because General Mills did violate § 110545, she paid good money for a product with no value. She lost money when she received inedible poison from Defendant, not food fit for human consumption.

## IX.   DELAYED DISCOVERY

116.     Plaintiff did not discover that Defendants' behavior was unfair and unlawful until February 2022, when she learned General Mills had been selling Hamburger Helper illegally for years. Until this time, she lacked the knowledge regarding the facts of her claims against General Mills.

117.     Specifically, throughout the Class Period, Plaintiff was generally aware that consuming trans fat caused health problems.

118.     However, during this time, Plaintiff did not know that partially hydrogenated oil was the source of artificial trans fat in food until 2022, or otherwise understand the connection between partially hydrogenated oil and trans fat.

119.     Ms. Schweinsburg first learned that PHO was the primary source of artificial trans fat during a meeting with her attorneys in February 2022.

120.     Plaintiff is a reasonably diligent consumer who exercised reasonable diligence in her purchase, use, and consumption of Hamburger Helper. Nevertheless, she would not have been able to discover Defendants' unfair and unlawful practices and lacked the means to discover them given that, like nearly all consumers, she is not an expert on nutrition and does not typically read or have ready access to scholarly journals such as The Journal of Nutrition,[42] The European Journal of Clinical Nutrition,[43] and The New England Journal of Medicine,[44] where the scientific evidence of artificial trans fat's dangers was published.

---

[42] Peter M. Clifton et al., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction*, 134 J. NUTR. 874, 874-79 (2004).

[43] A. Tavani et al., *Margarine intake and risk of nonfatal acute myocardial infarction in Italian women*, 51 EUR. J. CLIN. NUTR. 30–32 (1997) (estimating a 50 percent greater risk of heart attack in women with high consumption of margarine, an association "independent of body mass index, history of hypertension and hyperlipidemia").

[44] Mozaffarian, 354 NEW ENG. J. MED. at 1611 ("10 to 19 percent of CHD events in the United States could be averted by reducing the intake of trans fat").

CLASS ACTION COMPLAINT

## X.   ADDITIONAL TOLLING ALLEGATIONS

121.   At all relevant times, General Mills was aware that the consumption of PHO caused the health problems described herein.

122.   As a food producer, General Mills had had a continuing and affirmative moral and legal obligation to refrain from selling food which contained poisonous and deleterious substances but chose to ignore this obligation to do so.

123.   Class members had no duty and no reason to inquire as to whether Hamburger Helper contained poisonous and deleterious substances in violation of state and federal food safety laws. California, as a matter of economic regulation, places the burden of ensuring packaged foods are wholesome and safe to eat on their manufacturers, not the general public

124.   Reasonable consumers, including Plaintiff, had no reason to suspect General Mills' unfair competition and violations of federal and state law prohibiting the sale of food containing poisonous and deleterious substances.

125.   General Mills owed a special duty to Plaintiff and all Class Members, akin to a fiduciary duty, which it violated by inserting an ingredient that it knew was toxic. During the entire Class Period, General Mills was aware its conduct was oppressive and cruel, causing permanent physical as well as economic injury, and consciously continued these acts for years while knowing the extent of the harm it was causing. Equity and the public policy of California, embodied in its statutes, jointly demand, in such circumstance, that laches and tolling cannot apply in such a way to permit Defendants to continue to enjoy the fruits of their intentional, cruel, oppressive, and unlawful acts.

## XI.   CLASS ACTION ALLEGATIONS

126.   Plaintiff brings this action on behalf of herself and all others similarly situated (the "Class"), excluding Defendants' officers, directors, and employees, and the Court, its officers and their families. The Class is defined as:

> All citizens of California who purchased Hamburger Helper, Tuna Helper, and/or Chicken Helper containing partially hydrogenated oil in California between January 1, 2000 and December 31, 2016.

127.   Questions of law and fact common to Plaintiff and the Class include:

   a.   Whether Defendants' conduct constituted a violation of the unfair prong of

19

California's Unfair Competition Law;

b. Whether Defendants' conduct constituted a violation of the unlawful prong of California's Unfair Competition Law;

c. Whether Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers;

d. Whether the slight utility Defendants realized as a result of their conduct outweighs the gravity of the harm the conduct caused to its victims;

e. Whether Defendants' conduct violated public policy as declared by specific constitutional, statutory, or regulatory provisions;

f. Whether the injury to consumers from Defendants' practices is substantial;

g. Whether the injury to consumers from Defendants' practices is outweighed by benefits to consumers or competition;

h. Whether Class members are entitled to restitution;

i. Whether Class members are entitled to an injunction and, if so, its terms; and

j. Whether Class members are entitled to any further relief.

128.   By purchasing Hamburger Helper, all Class members were subjected to the same wrongful conduct.

129.   Plaintiff's claims are typical of the Class's claims because all Class members were subjected to the same economic harm when they purchased Hamburger Helper and suffered economic injury.

130.   Plaintiff will fairly and adequately protect the interests of the Class, has no interests that are incompatible with the interests of the Class, and has retained counsel competent and experienced in class litigation.

131.   The Class is sufficiently numerous, as it includes thousands of individuals who purchased Hamburger Helper in California during the Class Period.

132.   Class representation is superior to other options for the resolution of the controversy. The relief sought for each Class member is small, as little as one dollar for some Class members. Absent the availability of class action procedures, it would be infeasible for Class members to redress the wrongs done to them.

133.   Questions of law and fact common to the Class predominate over any questions affecting only individual members.

**First Cause of Action**

**Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.***

134.    In both causes of action, Plaintiff realleges and incorporates by reference each and every allegation contained elsewhere in the Complaint, as if fully set forth herein.

**Unfair Conduct**

135.    The business practices and omissions of Defendants as alleged herein constitute "unfair" business acts and practices in that Defendants' conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to Defendants' victims.

136.    Further, Defendants' practices were unfair because they violated public policy as declared by specific constitutional, statutory, or regulatory provisions, including those embodied in the FDCA, California Health and Safety Code, and California Education Code.

137.    Moreover, Defendants' practices were unfair because the injury to consumers from Defendants' practices was substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided or should be obligated to avoid.

**Unlawful Conduct**

138.    Defendants have made and distributed, in interstate commerce and in this county, products that contained unlawful food additives. Hamburger Helper was placed into interstate commerce by General Mills.

139.    Defendants' conduct was "unlawful" because it violated the Federal Food, Drug, and Cosmetic Act ("FDCA"), specifically, the Food Additives Amendment of 1958, which deems a food additive unsafe unless it has met two exceptions, neither of which the PHO used in Hamburger Helper products has met. 21 U.S.C. §§ 348, 342.

140.    Defendants' conduct violated California's Sherman Law, because Hamburger Helper contained PHO, which is a "poisonous or deleterious substance that may render it injurious to health of man or any other animal that may consume it." Health & Safety Code § 110545.

141.    The use of artificial trans fat in Hamburger Helper thus constituted violations of the FDCA and the Sherman Law and, as such, violated the "unlawful prong" of the UCL.

142.    Plaintiff suffered injury in fact and lost money or property as a result of Defendants' unlawful acts: she was denied the benefit of the bargain when she decided to purchase Hamburger Helper over competing products that were less expensive and/or contained no artificial trans fat.

143.    Had Plaintiff been aware of Defendants' unlawful conduct, she would not have purchased Hamburger Helper.

144.    Defendants' unlawful acts allowed it to sell more units of Hamburger Helper than it would have otherwise, and at a higher price, and higher margin.

145.    Plaintiff seeks an order for the disgorgement and restitution of all revenue received by General Mills from the sale of Hamburger Helper and has no adequate remedy at law.

## Second Cause of Action

## Breach of Implied Warranty of Merchantability

146.    Plaintiff realleges and incorporates by reference each and every allegation contained elsewhere in the Complaint, as if fully set forth herein.

147.    General Mills, through its acts and omissions set forth herein, in the sale, marketing and promotion of Hamburger Helper, made representations to Plaintiff and the Class that Hamburger Helper was safe to consume.

148.    General Mills is a merchant with respect to the goods of this kind which were sold to Plaintiff and the Class, and there was in the sale to Plaintiff and other members of the Class an implied warranty that those goods were merchantable, which in the case of food means they are fit from human consumption and do not contain illegal and toxic additives.

149.    General Mills breached that implied warranty, however, in that Hamburger Helper was not fit for its ordinary purpose in that it was not safe, wholesome, and legal food products.

150.    During the Class Period, Hamburger Helper were not fit for human consumption and had a value of $0.

151.    As an actual and proximate result of Defendants' conduct, Plaintiff and the Class did not receive goods as impliedly warranted by General Mills to be merchantable in that they were not fit for their ordinary purpose of human consumption.

22

152. Plaintiff and the Class have sustained damages as a proximate result of the foregoing breach of implied warranty in the amount of Hamburger Helper' purchase price.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself, all others similarly situated, and the general public, prays for judgment against General Mills as follows:

A.   An order confirming that this class action is properly maintainable as a class action as defined above, appointing Plaintiff and her undersigned counsel to represent the Class, and requiring General Mills to bear the cost of class notice;

B.   An award of actual damages, punitive damages, and restitution of $60 million;

C.   Declaratory relief that the conduct alleged herein is unlawful;

D.   Pre-judgment, and post-judgment interest; and

E.   An award of attorney fees and costs.

## XIII.   NO JURY DEMAND

Plaintiff makes no jury demand.

DATED: February 22, 2022                    Respectfully Submitted,

*Gregory Weston*

**THE WESTON FIRM**
GREGORY S. WESTON

**Counsel for Plaintiff Loretta Schweinsburg**

23

CLASS ACTION COMPLAINT